UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING COMPOUND
SEMICONDUCTOR SOLUTIONS, LLC,

        Plaintiff,                              Case Number 11-14255
                                                            Honorable Thomas L. Ludington

v.

CREE, INC.,

        Defendant.

_____/

**OPINION AND ORDER AUTHORIZING LIMITED DISCOVERY, SCHEDULING
LIMITED EVIDENTIARY HEARING, AND DIRECTING SUPPLEMENTAL
BRIEFING**

On December 22, 2011, Plaintiff Dow Corning Semiconductor Solutions, LLC, ("Dow

Corning") filed a complaint against Cree, Inc. ("Cree") seeking a declaratory determination that the

three patents, U.S. Patent No. 7,314,520, U.S. Patent No. 7,314,521 and U.S. Patent No. 7,294,324,

(collectively, the "patents-in-suit") were invalid and that, in any event, they had not infringed the

patents-in-suit. Cree subsequently filed a motion to dismiss for lack of subject matter jurisdiction

in lieu of an answer. ECF No. 10. In response to that motion, Dow Corning filed an Amended

Complaint (ECF No. 14), effectively mooting the original motion, and Cree renewed its motion in

light of the amended complaint. ECF No. 19. Dow Corning alleges that beginning in October 2010

it became "the target of a continued campaign by Cree to enforce its [silicon carbide] patents on

semiconductor material against Dow Corning's SiC products." Amended Compl. ¶ 23. The

Amended Complaint concludes with the summary assertion that "[b]ased on Cree's aggressive

licensing conduct, public statements, and history of litigation in support of its patent enforcement

program, a substantial controversy now exists between the parties which is of sufficient immediacy

and reality to warrant declaratory relief."  Amended Compl. ¶ 25.

Cree has filed a renewed motion to dismiss Dow Corning's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), contending that this Court does not have subject matter jurisdiction "because at the time that the action was filed, there was no substantial or immediate case or controversy between the parties."  ECF No. 19 at 2.  "None of [its] prior conduct, including its prior litigation history, can be reasonably inferred as demonstrating" its intent to enforce its patents and thus there is "no actual case or controversy, let alone the required 'substantial' and 'immediate' controversy."  ECF No. 19 at 9.

A hearing on Defendant's motion was conducted on March 18, 2012.  During the hearing, defense counsel clarified that he believed Defendant's motion should be considered a factual attack and invited the Court to "focus on the contemporaneous record" of the relevant events as opposed to the "single declaration filed by Dow that was drafted after the amended [complaint] or at least after the complaint was filed." Hr'g Tr. at 4. Counsel continued "[i]ts really two versions of the story and the Court will have to make a decisions as to, is it going to focus on the contemporaneous record or is it going to put these aside and give a lot of credence to a post-complaint declaration.  *Id.* at 5. Dow Corning's counsel, by contrast, characterized Cree's Rule 12(b)(1) motion as a "facial attack because they don't challenge any of the facts." *Id.* at 40. That is, "[t]hey do offer additional facts and try to put a different spin on it but our view is that doesn't change what we have pled in the complaint, therefore, under the caselaw, should be considered as true." *Id.*

The Court concludes that Defendant's characterization of its motion as a factual attack is most accurate.  That is, there is no case or controversy if, as Cree suggests, their employees' communication with Dow Corning's employees outlined in the Amended Complaint was never

-2-

intended to assert that Dow Corning was infringing its patents or that it intended to enforce the patents-in-suit against Dow Corning.  Because the Court must evaluate the accuracy of the factual assertions as opposed to their sufficiency, a limited amount of discovery and, if necessary, an evidentiary hearing to assist the Court in policing its limited jurisdiction.

## I.    Standard of Review

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Generally, motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction fall into two categories: facial attacks and factual attacks.  *United States v. Richie*, 15 F.3d 592, 598 (6th Cir. 1994) *cert. denied* 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994).  A facial attack challenges the sufficiency of the complaint itself.  *Id.* A factual attack, on the other hand, challenges the factual existence of subject matter jurisdiction.  *Id.* On such a motion, no presumptive truthfulness applies to the factual allegations" and "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.*   In reviewing a motion challenging the factual sufficiency of a complaint, a district court has wide discretion to allow affidavits, documents, and even conduct a limited evidentiary hearing if necessary. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990). Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

Neither party explained in their respective briefs whether the challenge at issue is a factual or a facial attack.  At oral argument, Cree clarified that it is challenging the factual existence of subject matter jurisdiction. Dow Corning contended that the attack was more appropriately

characterized as a facial attack because Cree does not dispute the facts raised in the complaint, but instead only disputes how Dow Corning has characterized some of the facts.  However, because Cree is challenging the interpretation of certain facts as reflecting an actual controversy, Cree's motion is appropriately considered a factual attack on the Court's authority to exercise subject matter jurisdiction. Thus, no presumptive truthfulness applies to the allegations in the complaint and the Court is empowered to resolve factual disputes. *Richie*, 15 F.3d at 598.

### B.    Case or Controversy

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201. The Declaratory Judgment Act is not an independent basis for subject matter jurisdiction. *See Prasco, LLC v. Medics Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008). Instead, it provides a remedy if the court already has jurisdiction. *Id.* A federal court's jurisdiction under the Declaratory Judgment Act is limited by Article III, which restricts the judicial power to actual "cases" or "controversies." U.S. Const. art. III; *Prasco*, 537 F.3d 1335. The party seeking the declaratory judgment bears the burden of proving facts supporting the court's jurisdiction at the time the complaint was filed and throughout the case. *Benitec Australia, Ltd v. Nucleonics, Inc*., 495 F.3d 1340, 1344 (Fed. Cir. 2007).

Federal courts have jurisdiction only if the "facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune Inc. v. Genentech, Inc*., 549 U.S. 118, 127 (2009) (emphasis added). In patent cases, the Article III case or

-4-

controversy requirement "may be met where the patentee takes a position that puts the declaratory judgment plaintiff in the position of either pursuing arguably illegal behavior or abandoning that which he claims a right to do." *SanDisk Corp v. STMicroelectronics*, 480 F.3d 1372, 1381 (Fed. Cir. 2007). The dispute "must be definite and concrete, touching the legal relations having adverse legal interests" and "be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " *MedImmune Inc*., 549 U.S. at 127 (citation omitted). To determine jurisdiction, the court employs a totality-of-the-circumstances test considering "whether under all the circumstances show that there is a substantial controversy between parties having adverse legal interest of sufficient immediacy and reality to warrant the issue of a declaratory judgment." *Id.*

"In the context of conduct prior to the existence of a license, declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement without some affirmative act by the patentee." *SanDisk Corp.*, 480 F.3d at 1380-81 (emphasis added). Affirmative acts giving rise to jurisdiction are not limited to a patentee's explicit assertion of right, the case or controversy requirement is also satisfied by "conduct that can be reasonably inferred as demonstrating intent to enforce a patent . . ." *Hewlett Packard v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). The question of whether conduct may be reasonably inferred as demonstrating such an intent is objective; the declaratory judgment plaintiff's subjective belief is "irrelevant." *Id.* at 1363.

### 1.    Public Statements And Annual Reports Indicating An Aggressive Licensing And Litigation Strategy

Declaratory judgment jurisdiction is supported when a patentee touts a patent enforcement

strategy comprised of aggressive licensing and litigation. For example, in *Micron Tech., Inc. v. Mosaid Tech., Inc.*, 518 F.3d 897 (Fed. Cir. 2008), the patentee "pursue[d] a systematic licensing and litigation strategy" and issued public statements and annual reports confirming its "intent to pursue [an] aggressive licensing strategy." Based in part on such conduct, in a totality of the circumstances analysis, the Federal Circuit found declaratory judgment jurisdiction. *See Micron Tech.*, 518 F.3d at 901 ("[the patentee's] recent public statements and annual reports also confirm its intent to continue an aggressive litigation strategy . . . [which] amply supports a real and substantial dispute between [the] parties.").

2.   **A Consistently Litigious History, Particularly If Directed To Competitors And Related To Similar Patents and Technology**

Courts have found actual controversies and declaratory judgment jurisdiction when the patentee manifests an intent to enforce its patent rights through a consistent history of patent litigation, particularly where the subject matter of the prior cases was the same or related technology. *See Hewlett- Packard*, 587 F.3d at 1364 ("A history, or the lack thereof, of litigating in the industry can certainly be a factor to be considered."); *Pharmanet, Inc. v. DataSci LLC*, Civ. No. 08-2965- GEB, 2009 WL 396180 (D.N.J. Feb. 17, 2009) (denying patentee's motion to dismiss because it had filed seven patent infringement lawsuits against other vendors, reasoning that "the Federal Circuit and several other courts have held that a patentee's history of litigation with other parties is an appropriate factor for courts to consider."); *see also Micron Tech.*, 518 F.3d at 901, 905 (finding jurisdiction where declaratory judgment plaintiff Micron watched as patentee Mosaid sued three competitors that, like Micron, made memory chips, and suspecting it was likely next on Mosaid's list thus seeking a declaration of noninfringement for 14 patents, some of which were not previously asserted by Mosaid). "[T]he fact that [a patentee] had filed infringement suits against

-6-

other parties for other products does not, in the absence of any act directed toward [the declaratory judgment plaintiff], meet the minimum [case or controversy] standard discussed in *MedImmune*." *Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed Cir. 2010).

### 3.  A Patentee's Unacceptable And Inflexible Licensing Demands During Negotiations

A real, immediate, and substantial controversy can arise when a patentee makes inflexible and unacceptable licensing demands in an attempt to enforce its patents. *SanDisk*, 480 F .3d at 1382 (finding declaratory judgment jurisdiction and vacating district court's dismissal because licensing discussions were effectively brought to an end even though licensing negotiations had not been terminated, noting that "a party to licensing negotiations is of course within its rights to terminate negotiations when it appears that they will be unproductive."); *Sony Elec., Inc. v. Guardian Media Techs ., Ltd.*, 497 F.3d 1271, 1286 (Fed. Cir. 2007) (holding that the "patentee's apparent continued willingness to engage in licensing negotiations does not prevent a plaintiff from maintaining a declaratory judgment suit" because "[the patentee] was within its rights to terminate them when it determined that further negotiations would be unproductive").

### 4. The Setting Of A Deadline By A Patentee For Accepting Terms After Protracted And Unfruitful Negotiations

The setting of a deadline by a patentee for accepting terms after protracted and unfruitful negotiations can be a factor that supports declaratory judgment jurisdiction. For example, in *Hewlett-Packard*, the Federal Circuit reversed the district court, finding declaratory judgment jurisdiction existed because the patentee imposed deadlines for the declaratory judgment plaintiff to respond to, which was a factor that "must be considered along with all the circumstances at bar," and indicated that the patentee was "implicitly asserting its rights under the [patent-in-suit]." *Hewlett-Packard Co.*, 587 F.3d at 1362, 1363.

## II.   Dow Corning's Allegations

Dow Corning is a Delaware company headquartered in Midland, Michigan. Dow Corning is a manufacturer of electronic-grade SiC, which is a crystalline semiconductor material that is used in lighting, power and communication components. From 2003 to October 2010, Dow Corning alleges it has invested millions of dollars developing its own proprietary SiC crystal manufacturing technology. Dow Corning has also developed proprietary technology for manufacturing gallium nitride ("GaN"), another crystalline semiconductor material that is used in lighting, power and communication components. Dow Corning is gaining traction in the SiC market that it contends has been traditionally dominated by Cree.

On October 29, 2010, Cree sent a letter to Dow Corning that Dow Corning characterizes as initiating its patent enforcement program against it. Dow Corning notes that the letter made references to some of Dow Corning's products as well as listing a number of Cree products. Dow Corning did not respond to Cree's October 29, 2010 letter, but did request a meeting after Cree contacted Dow Corning again on December 8, 2010.

On March 8, 2011, representatives of both Cree and Dow Corning met to discuss Cree's SiC Materials Licensing Program. The titles of the first three patents addressed were: Low micropipe 100 mm silicon carbide wafer, Low 1C Screw Dislocation 3 Inch Silicon Carbide Wafer, and Three inch silicon carbide wafer with low warp, bow, and TTV—the size characteristics of which correspond to the size of the Dow Corning products identified in Cree's October 29, 2010, letter. Zoes Decl. Ex. 6.

At that meeting, Cree explained that its IP strategy was to: (1) "Develop intellectual property to enable manufacture of core products and protect core product inventions;" and (2) "[l]icense

-8-

certain non-core technology," including SiC materials. Ex. 2 at 6. The SiC Materials Licensing

Program included 34 SiC wafer U.S. patents, 29 SiC epitaxy U.S. patents, 14 SiC wafer patent

applications, 6 SiC epitaxy patent applications, and the corresponding foreign patents and

applications. Brandes Decl. Ex. 2 at 6. The slide presentation describes in general terms, with one

slide per patent, nine of Cree's patents, with representative independent claims, that were available

for licensing. Brandes Decl. Ex. 2 at 7-15. Cree's concluding presentation slide noted that "[k]ey

to [the industry's] transformation is providing products free of IP concerns," that "[m]ultiple SiC

material suppliers with full rights to make and sell material will speed adoption," and that

"[a]ddressing IP issues removes ambiguity from the marketplace." Cree's presentation noted that

one of the keys to growing the SiC market is having multiple suppliers with limited IP concerns. The

parties did not then negotiate a license or otherwise resolve the "ambiguity." Zoes Decl. at par. 15.

On June 14, 2011, Tim Troy of Dow Corning Corporation, who is in-house counsel for Dow

Corning, asked outside patent counsel to study the patents that are now in suit and advise Dow

Corning about those patents. Zoes Decl. at par. 121.

In response to Cree's presentation, Dow Corning asked whether Cree would be willing to

license other technologies such as gallium nitride ("GaN"). Brandes Decl. Ex. 6. Cree requested a

second meeting, and Dow Corning requested that, at the second meeting scheduled for June 29,

2011, Cree present: "(1) Potential scenarios for technology licensing, including the technology

transfer scenario [the parties] discussed in the last meeting. (2) A broader list of patents that Cree

would be willing to license, including the Nitride materials program." Brandes Decl. Ex. 6. Cree

agreed to discuss both topics at the next meeting. Brandes Decl. Ex. 7. Cree also sent Dow Corning

an email informing Dow Corning that Cree had "recently concluded a SiC materials patent license

agreement with Nippon Steel Corporation" and attaching a copy of the press release. Brandes Decl. Ex. 3; Ex. 5. The NSC business deal was concluded without any litigation between the parties.

Following the March 8, 2011 meeting, the parties executed a "Reciprocal Non-Disclosure Agreement" ("NDA") to facilitate open discussions between the parties without fear that certain information would be disclosed or used for improper or counterproductive purpose. Brandes Decl. Ex. 4 at 1 ("Purpose of exchange"). Under the terms of the NDA, information subject to the NDA "shall be used only for the purpose stated above" which was limited to "[ d]iscussion concerning Cree's Materials Patent Licensing Program." Brandes Decl. Ex. 4 at 1, 2. Information subject to the NDA cannot be used for any other purpose. Brandes Decl. Ex. 4 at 2. The effective date of the NDA was June 9, 2001. Brandes Decl. Ex. 4 at 3. The parties understood that the discussions and communications that took place after that date, including those at the June 29 and September 28, 2011 meetings discussed below, were subject to the NDA.

On June 29, 2011, the parties met in Midland, Michigan. At the meeting, Cree presented Dow Corning with the possibility of licensing five different groups of patents and patent applications: "(1) SiC Bulk Growth and Wafering, (2) SiC Epitaxy, (3) Nitride Epitaxy, (4) HVPE Nitride - Baselayers, and (5) AIN Bulk Growth and Wafering." Brandes Decl. at 15; Ex. 8 at 2. Cree declined to offer the "technology transfer" package that had previously been discussed. *Id.* at 8. The purpose of the presentation was to offer Dow Corning a choice between the five programs. Dow Corning asked if it could license individual patents from the portfolios, such as the three patents now in suit. Zoes Decl. at par. 17. George Brandes for Cree replied that this would not be possible and that Dow Corning's only option was to license all 48 SiC wafer patents, and/or all 34 epitaxial patents, and/or all nitride patents, or none at all. *Id.* Cree offered only one payment option: an up

front lump sum fee, plus an ongoing royalty. Zoes Decl. at par. 19. Tom Zoes of Dow Corning asked if Cree's offer was negotiable, and Cree said it was not. *Id.* Tom Zoes observed that "it sounds like you are telling us this is a take it or leave it offer," which Cree represented was correct. *Id.* Cree's portfolio bundling and payment demands were unacceptable to Dow Corning and again, the parties were then unable to negotiate a license or other acceptable resolution to Cree's concerns. Zoes Decl. at pars. 17, 19.

Following the June 29, 2011 meeting, Dow Corning indicated that it remained interested in Cree's SiC Bulk and Epitaxy licensing program as well as the Nitride Epitaxy licensing programs. Brandes Decl. at par. 16. As a result, it requested that Cree provide a complete worldwide list of the patents included in the three licensing programs it was interested in. *Id.* Cree provided those lists on August 3, 2011, and also "propose[d] that [the parties] target meeting again at the end of September." Brandes Decl. at par. 16; Ex. 9; Ex. 10. The lists included an identification of over 900 patents and applications pending throughout the world. *Id.* On September 8, 2011, Cree wrote to Dow Corning confirming the follow-up meeting scheduled for September 28, 2011 and confirming that the purpose of the meeting was to hear from Dow Corning regarding its interest in the various licensing programs Cree had presented during the previous meetings. Brandes Decl. at par. 17; Ex. 11. Cree also set the September 28, 2011, meeting as the deadline for responding to Cree's licensing program.

On September 27, 2011, the day before the parties' scheduled third meeting, Dow Corning filed this declaratory judgment action against Cree. The Complaint seeks a declaratory judgment of invalidity and noninfringement for U.S. Patent No. 7,314,520, U.S. Patent No. 7,314,521 and U.S. Patent No. 7,294,324.

In the past decade, Dow Corning notes that Cree initiated six patent infringement suits against four different competitors involving semiconductor materials in 2000, 2001, 2003, 2006, 2010, 2011. *See* Zoes Decl. Ex. 2 at 1-6. A total of ten patents were litigated, and they all disclose the use of SiC and GaN for use as lighting, power and communication components. Declaration of Chi Cheung in Support of Dow Corning's Opposition to Cree's Renewed Motion to Dismiss ("Cheung Decl.") at pars. 2-3. In this case, the patents-in-suit also cover SiC, which Dow Corning manufactures and sells for use as lighting, power and communication components. In 2006, Cree's chairman and CEO Charles Swoboda highlighted his company's patent enforcement approach in a press release following the initiation of a suit against BridgeLux:

> The filing of this suit demonstrates Cree's willingness to protect our R&D investments and patent rights, especially at a time when some segments of the LED marketplace act as if there are no issues with intellectual property.

ECF No. 21 Ex. 3 at 1.

On July 29, 2010, The Fox Group, Inc., ("Fox Group") sued Dow Corning Corporation and Cree in the Eastern District of Virginia for infringement of two patents directed to SiC (the "Fox Litigation"). Dow Corning Corporation moved to transfer venue to the Southern District of New York, and on October 25, 2010, its motion was granted. However, Fox's case against Cree remained and proceeded in the Eastern District of Virginia. Cree then contacted Dow Corning to request the first meeting regarding its licensing program four days after the two were no longer defendants in the Fox Litigation.

### IV.   Defendants' Contrasting Factual Assertions

Cree is also a leading manufacturer of electronic-grade silicon carbide ("SiC"), which is a high performance semiconductor material used in the production of a broad range of lighting, power

and communication components.  Cree was founded in 1987 by graduates of North Carolina State University and was a pioneer in the development and manufacture of commercial-quality SiC wafers. In 2010, Cree instituted a licensing program for its intellectual property associated with the manufacture of SiC materials.  Cree characterizes its objective as making the patented technology available to those that were interested with the hope that this would help the growth of the SiC market. By April 2011, Cree announced the closing of a business deal with Nippon Steel Corporation ("NSC") whereby Cree and NSC entered into a global SiC materials license agreement. At the time that Cree closed the NSC deal, Cree was also having discussions with Dow Corning as to whether it too would be interested in licensing Cree's patented technology.

Cree contends that its October 29, 2010, letter was meant to introduce its SiC Materials Licensing Program and propose a meeting to discuss that program. Brandes Decl. Ex. 1. Cree represents that the letter did not accuse Dow Corning of patent infringement or make any comparison of any Dow Corning product or research to any of the over 80 patents and applications referenced in the attachment to the letter. Brandes Decl. Ex. 1. The letter did not demand that Dow Corning obtain a license or demand that it meet with Cree. *Id.*

Cree also characterizes the objective of the March 8, 2011, meeting as to "sell" its licensing program. During the presentation, Cree stated that they "were bringing their licensing program to Dow Corning to ensure supply of silicon carbide wafers to the industry was not interrupted." Zoes Decl. par. 15. The nine patents were chosen based on Cree's belief that they would be the most enticing. The presentation did not describe any Dow Corning products or research, make any attempt to compare any activities or products of Dow Corning to the nine patents, or any other patents for that matter, or include any allegation of patent infringement. *Id.*

-13-

Cree represents that at it did not, at any time in its written correspondence or at the meetings, assert that Dow Corning was infringing any of Cree's patents or imply that Cree would sue Dow Corning if it did not license its patents. Cree submits that this offer was not a final offer

Cree submits that at no time prior to filing the instant suit did Dow Corning state it was not interested in or did not need a license to any of the patents-in-suit or any other Cree patent. *Id.* Dow Corning had instead expressed interest in expanding the parties' discussions from Cree's SiC Materials Licensing Program to include Cree's GaN licensing program as well. Brandes Decl. at pars. 9,13. In addition, prior to suit, the parties did not have any discussion or disagreement over whether Dow Corning was infringing the three particular patents-in-suit, or whether it believed any Cree patents were somehow not valid. Brandes Decl. at par. 18. Cree characterizes the nature of the discussions as friendly, cooperative and positive, until Dow Corning filed suit on September 27,2011. Brandes Decl. at par. 5. Cree notes that the Amended Complaint does not contain any allegation that Cree accused Dow Corning of infringing any of its patents, any allegation that Cree examined any of Dow Corning's SiC products, processes or research & development, any allegation that Cree intended to file a lawsuit to assert infringement, any discussion of Dow Corning's products or any allegation that Cree had set a "take it or leave it" deadline to respond to its business discussions.

The third meeting between Dow Corning and Cree took place on September 28, 2011 - the day after Dow Corning filed its original Complaint. Though there was no formal agenda for the meeting, Dow Corning was expected to respond to the licensing programs that Cree had previously presented. Brandes Decl. at par. 17; Ex. 11. No one from Dow Corning notified anyone from Cree that outside counsel would be joining the meeting. Brandes Decl. at par. 19. During the meeting,

Dow Corning's outside counsel presented an opinion that a handful of the patents selected from the over 900 patents and applications made available for licensing - the patents-in-suit - were invalid. *Id.* Dow Corning's outside counsel did not discuss whether or not Dow Corning infringed the patents-in-suit. *Id.* In Dow Corning's final slide presented at the meeting, Dow Corning disclosed that they had filed this lawsuit. Brandes Decl. at par. 20. Near the end of the meeting, Dow Corning communicated that it would be willing to "stay" the litigation if they thought that doing so would allow for continued business discussions on their terms. Brandes Decl. at par. 21. Dow Corning also communicated that simply because they "filed" this lawsuit did not mean that they would have to "serve" the original Complaint, implying that Dow Corning desired to continue the previous discussions without the lawsuit formally proceeding. *Id.*

With regard to its litigation history, Cree notes that the statement it issued regarding the initiation of the lawsuit against BridgeLux was made over five years ago in reference to GaN litigation, not Cree's SiC products, and contends that Dow Corning is inappropriately commingling Cree's SiC business with its distinctly different GaN business.

## V.   Analysis

Cree contends that this case should be dismissed for lack of subject matter jurisdiction because none of the circumstances indicate that a substantial and immediate case or controversy exists requiring resolution by the federal court system. Cree argues that the facts do not support Dow Corning's suggestion that the parties were negotiating a license in order to avoid litigation over alleged infringement. In its written and oral communications with Dow Corning, Cree did not assert its rights under the patents-in-suit or accuse Dow Corning of infringement. Prior to filing suit, Dow Corning never, in any of its written or oral communications, asserted that it was not infringing

-15-

Cree's patents or that Cree's patents were invalid. In the time leading up to this lawsuit, Cree did not take any position that would require Dow Corning to either pursue arguably illegal behavior or abandon what Dow Corning has claimed a right to do. Cree submits that none of its prior conduct, including its prior litigation history, can be reasonably inferred as demonstrating the intent to enforce the patents-in-suit against Dow Corning. Accordingly, because there is no actual case or controversy, let alone the required "substantial" and "immediate" case or controversy, between the parties, this case should be dismissed.

### A.    Use of Any of the Communications After the June 9, 2011 NDA

Cree and Dow Corning entered into the NDA so that they could exchange materials with the assurance that those materials would be used for one stated purpose: to further "discussions concerning Cree's Material Patents Licensing Programs." Brandes Decl. at par. 11; Ex. 4 at 1 ("Purpose of exchange"). Under the terms of the NDA, all communications between the parties dated after June 9, 2011, which are conspicuously marked "confidential" or "proprietary," shall only be used for that stated purpose and "shall not be disclosed to any third party." *Id.* Ex. 4 at 2 . Cree contends that paragraphs 15-18 and 24 of the Amended Complaint inappropriately rely on information or materials that are subject to the NDA because all the emails after June 9, 2011 and all of the slides presented at the June 29, 2011 meeting were marked as confidential and proprietary and should not be considered in determining the current motion.

Dow Corning submits that the NDA does not protect the communications and facts set forth in paragraphs 15-18 and 24 of the Amended Complaint. Dow Corning emphasizes that much of the information disclosed in paragraphs 15-18 and 24 are simply dates and attendees of meetings, correspondence in anticipation of those meetings, or are general characterizations of what transpired

or was communicated at those meetings, much like information on a privilege log. None of this is protected by the NDA because it does not rise to the level of protectable confidential or proprietary information under a proper interpretation of the NDA. In particular, paragraph 18 does not set forth "specifications" or "technical information" or like information related to Cree's "Silicon Carbide and/or Nitride Materials" nor does it set forth any "license structure," "license fees/royalties" or "business plans" of Cree's patent enforcement program that the NDA is meant to protect. This paragraph instead is intended to demonstrate that Cree expected Dow Corning to respond.

Dow Corning also notes that none of George Brandes' oral communications to Dow Corning at the meetings were identified as confidential, nor were any of them subsequently confirmed as such by written notice. Thus, none of George Brandes' oral communications is protected by the NDA and Dow Corning's use of them in paragraphs 15-18 and 24 of the Amended Complaint is not in breach.

The NDA states that protected "confidential information" is that which relates to the subject of the disclosing party's information that is considered confidential and proprietary. The NDA does not state that unrelated, non-proprietary information contained in the same communication is protected. Based on this interpretation, the non-proprietary information is not protected because it is included in the same communication as proprietary information.

### B. Dow Corning's Justification for Declaratory Jurisdiction

Dow Corning contends that, in light of all the circumstances, there is a substantial controversy between Dow Corning and Cree having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *MedImmune*, 549 U.S. at 118, 127. Dow Corning also emphasizes that Cree's "divide and conquer" analysis, asserting that each fact in isolation is not sufficient to create declaratory judgment jurisdiction, is contrary to the operative

standard for declaratory judgment jurisdiction. The context of "under all the circumstances" here instead begins with the fact that Cree has amassed a substantial patent portfolio, which it couples with what Dow Corning characterizes as an aggressive enforcement program.

> For example, Cree has stated the following in every annual report since 2006:
>
> Licensing activities and lawsuits to enforce intellectual property rights, particularly patent rights, are a common feature of the semiconductor industry. We . . . make . . . inquiries regarding possible patent infringements in the normal course of business. Depending on the circumstances, we may seek to negotiate a license or other acceptable resolution. If we are unable to achieve a resolution by agreement, we may seek to enforce our rights or defend our position through litigation... Ongoing efforts to enforce our patent rights against infringers are essential to sustaining this higher perceived value.

*See, e.g.*, Zoes Decl. Ex. 1. Cree's press releases also demonstrate its aggressive patent enforcement policy. For example, following Cree's initiation of a lawsuit on patents that teach the use of SiC material in semiconductor devices, it issued a press release stating "[t]he filing of this suit demonstrates Cree's willingness to protect our R&D investments and patent rights, especially at a time when some segments of the LED marketplace act as if there are no issues with intellectual property. Zoes Decl. Ex. 3 at 1. Cree's announced practice of regular and aggressive licensing or litigation is thus one factor that "under all the circumstances" supports declaratory judgment jurisdiction. *MedImmune*, 549 U.S. at 127; *see also Micron Tech.*, 518 F.3d at 901 ("[the patentee's] recent public statements and annual reports also confirm its intent to continue an aggressive litigation strategy . . . (which) amply supports a real and substantial dispute between these parties.").

Cree finds its prior involvement in patent litigation irrelevant because the patents-in-suit concern Cree's SiC technology and not "gallium nitride land LED technology" as Dow Coming asserts. *Id.* Cree's light emitting device business based on GaN technology is separate from Cree's SiC materials business. Brandes at, 27. In addition, in spite of the fact that Dow Corning was aware

of the NSC deal, the Complaint does not mention the fact that the one and only SiC Materials Licensing Program deal Cree has entered into was completed without any resort to litigation. The law is clear that prior litigation against different parties involving different technology does not itself give rise to subject matter jurisdiction. The Federal Circuit has explained:

> [W]hile prior litigation is a circumstance to be considered in assessing the totality of the circumstances, the fact that [the patent holder] had filed infringement suits against other parties for other products does not, in the absence of any act directed toward [the declaratory judgment plaintiff], meet the minimum [case or controversy] standard discussed in *MedImmune*.

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc*., 599 F.3d 1377, 1382 (Fed Cir. 2010); *see also Panavise Prods Inc v. National Prods Inc*, 306 F. App'x 570 (Fed. Cir. 2009).

Cree has not asserted the patents-in-suit against any party, including Dow Corning. Brandes Decl. at par. 23. The only prior litigation initiated by Cree concerning Cree's own patents involved technology unrelated to the patents-in-suit. Brandes Decl. at par. 27. Specifically, Cree's prior litigation involved its patented GaN and light emitting device technology. *Id.* Cree has likewise never brought an action for patent infringement against Dow Corning. Brandes Decl. at par. 26. Accordingly, under Federal Circuit law, there is no "prior litigation history" that would support an inference that Cree intends to enforce the patents-in-suit against Dow Corning.

Second, Dow Corning contends that Cree has consistently followed its public statements with action—suing four different companies in six suits for infringing 10 patents. Zoes Decl. at par. 8. Each of those 10 patents address the use of SiC and GaN (both crystalline semiconductor materials) as lighting, power and communication components. Cheung Decl. at par. 2,3. Cree and Dow Corning are competitors in the manufacturing of SiC and GaN for use as lighting, power and communication components. Zoes Decl. at par. 15. Given that the SiC material covered by the patents-in-suit is used

-19-

as lighting, power and communication components and is closely related to the technology of the patents in the prior suits, Cree's practice of enforcing its patents through litigation is thus another factor that "under all the circumstances" supports declaratory judgment jurisdiction. *MedImmune*, 549 U.S. at 126; *see also Micron Tech.*, 518 F.3d at 899 (finding declaratory judgment jurisdiction where "[declaratory judgment patentee] watched [patentee] sue each of the other leading DRAM manufacturers."); *Hewlett-Packard*, 587 F.3d at 1364 ("A history, or the lack thereof, of litigating in the industry can certainly be a factor to be considered."); *Pharmanet*, 2009 WL 396180 ("a patentee's history of litigation with other parties is an appropriate factor for courts to consider").

Third, on October 29, 2010–four days after learning that it would not be codefendants with Dow Corning Corporation in the Fox Litigation–Cree sent a letter identifying two of Dow Corning's products: 3 inch (75.6 mm) and 4 inch (100 mm) SiC wafers. Brandes' Decl. Ex. 1. The same letter listed Cree patents directed to 3 and 4 inch SiC wafers. While the identification of a declaratory judgment-plaintiff's products and potentially applicable patents does not necessarily, by itself, impute declaratory judgment jurisdiction, Dow Corning contends that it is nevertheless an important, supporting factor under all the other circumstances detailed here. *See Hewlett-Packard*, 587 F.3d at 1360-61 (finding declaratory judgment jurisdiction where patentee's letters requested an "opportunity to discuss" (i) the patent, and (ii) "its relevance to [declaratory judgment plaintiffs] Blade Server products.").

Cree notes that the letter did not letter does not state or imply that Dow Corning needed a license, and that Cree has not asked Dow Corning to explain why its products do not infringe. The letter also did not state or imply that any one patent is relevant to any particular Dow Corning product or product line nor that the patents-in-suit are relevant to any particular Dow Corning

product or product line.  Instead, Cree characterizes the letter as only referring to a collection of over 80 Cree patents and applications included in Cree's SiC Materials Licensing Program. Moreover, Cree notes that it is not a holding company whose sole business is to license patents; it is a manufacturing company which benefits from its own use of patented technology. At oral argument, Cree emphasized that the letter was an introduction to a business proposition by virtue of Cree's business of selling materials; such a letter should be interpreted differently by a recipient than a letter from an entity whose sole business is pursuing patent litigation.  Dow Corning, however, contends that Cree has two separate business: one for selling products and another for monetizing its patent portfolio.  In bringing its "licensing program" to Dow Corning, Cree represented that it wanted to remove ambiguity from the market which Dow Corning interpreted as Cree suggesting that there is an overlap in the patents and potential infringements.

Fourth, when Dow Corning did not respond to Cree's October 29, 2010 letter, George Brandes contacted Dow Corning a second time on December 9, 2010 to again request a meeting. Zoes Decl. at pars. 10-11. Cree then pursued a second and third meeting with Dow Corning, and each time Cree's representatives traveled to this District for the meetings. Brandes Decl., Ex.3 at I; Brandes Decl. Ex.9. Such conduct by a patentee is yet another factor "under all the circumstances" in support of declaratory judgment jurisdiction. *MedImmue*, 549 U.S. at 127; see also Hewlett-Packard, 587 F .3d at 1360-61 (finding declaratory judgment jurisdiction where "[patentee] took the affirmative step of twice contacting [declaratory judgment plaintiff] directly.").

Fifth, at the first, March 8, 2011 meeting, the first three "Select Cree Patents" that Cree covered were specifically directed to 3 and 4 inch SiC wafers. Cree's March Presentation at 7-9 ("Low micropipe 100 mm silicon carbide wafer," "Low I C Screw Dislocation 3 Inch Silicon

Carbide Wafer," and "Three inch silicon carbide wafer with low warp, bow, and TTY."). Knowing that 3 and 4 inch SiC wafers are key new SiC products for Dow Corning, Cree concluded the presentation on its patents by stating that Dow Corning did not have full rights to make and sell its 3 and 4 inch SiC wafers, because of the IP concerns and issues under Cree's patents provided under the factual portion of this memorandum. Cree argues that accusation of infringement would require much more specific comparisons between the features of the patented technology and the potentially infringing products. Cree likewise did not compare any Dow Corning products with any of the nine patents discussed at the meeting.

 Furthermore, Cree stated that they "were bringing their licensing program to Dow Corning to ensure supply of silicon carbide wafers to the industry was not interrupted." Zoes Decl. at par. 15. Cree's message, while not using the term "infringement," was perceived as delivering the message that Dow Corning's new 3- and 4-inch SiC products had infringement issues with respect to Cree patents. As courts have recognized, "a declaratory judgment action cannot be defeated simply by the stratagem of a correspondence that avoids magic words such as 'litigation' or 'infringement.'" *ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011).

Cree emphasizes that, in determining whether subject matter jurisdiction exists over parties that meet to discuss a potential license, courts have focused on whether the patent holder's presentation included a comparison of its patents and the potential licensee's products. In cases where a patent holder has made a presentation mapping the elements of allegedly infringed claims against the aspects of accused products, courts have found that subject matter jurisdiction exits, *see, e.g.*, *SanDisk Corp.*, 480 F.3d 1372, and where the patent holder has not made such a demonstration of infringement, courts have denied a finding of subject matter jurisdiction, *See, e.g.*, *3D Systems,*

*Inc. v. Envisiontec, Inc.*, 575 F. Supp. 2d 799 (E.D. Mich. 2011) (dismissing the action for lack of subject matter jurisdiction where the patent holder had not made any mention of any of the particular claims and how they read on the declaratory judgment plaintiff's patents); *Wooster Bush v. Berman*, No. 5:06-cv-474, 2008 WL 1744782 (N.D. Ohio 2008) (finding that subject matter jurisdiction did not exist because, unlike *SanDisk*, there was no evidence that the patent holder had identified how a product infringed specific claims of the patents). Rather, Cree contends that the nine patents were chosen as representative examples of what patented technology was available under the SiC Materials Licensing Program. Moreover, the slides do not refer to all of the patents-in-suit. One patent–the '324 Patent–is not mentioned in any of the slides. Cree also notes that the discussions were regarding Cree's patents and not any discussion of whether any of Dow Corning's patents were infringing. *Cf. SanDisk*, 480 F.3d at 1382 (finding subject matter jurisdiction where "[d]uring discussions, the [patentee's] experts liberally referred to . . . present, ongoing infringement ... and the need for [the declaratory judgment plaintiff] to license those patents.").

Cree also contends that the pre-NDA emails do not create subject matter jurisdiction because they do not demonstrate any intent to enforce Cree's patents. Cree believes it is evident from these emails that Dow Corning did not respond to Cree's licensing discussions in the manner that one would expect if there actually was some threat of enforcement. Dow Corning did not defend its products or state that it does not need a license. Rather, it asked to license even more patented technology than Cree originally offered, and it asked for a "technology transfer." On April 29, 2011, Tom Zoes wrote to George Brandes, stating "we are interested in understanding the following . . . 1) Potential scenarios for technology licensing, including the technology transfer scenario we discussed at the last meeting 2) A broader list of patents that Cree would be willing to license,

-23-

including the Nitride materials patent."  Thus, Cree contends that Dow Corning welcomed the possibility of licensing Cree's patented technology and that Dow Corning's request for a technology transfer demonstrates that it was seeking to incorporate new technology that it did not already have, as opposed to seeking a license to protect itself from liability relating to the use of technology it already had.

Sixth, at the second, June 29, 2011 meeting, eight months after initiating contact, Cree presented non-negotiable licensing terms that Dow Corning found unacceptable. Zoes Decl. at pars. 17,19. Dow Corning specifically requested if it could license individual patents from Cree's portfolio, such as the three patents that are now in suit. Zoes Decl. par. 17. Cree represented that the license patents were only available in bulk, which would have included many patents that Dow Corning would not have found useful. *Id.*  Further, even if Dow Corning was willing to license Cree's patents in bulk, Cree was unwilling to negotiate the payment structure it had offered. *Id.* at par. 19. Cree's demand for a lump-sum payment and a running royalty was non-negotiable and a "take-it or leave-it" offer. *Id.* at pars. 17,19. Cree has repeatedly emphasized the importance of enforcing its patents. Because Cree's licensing proposal was unacceptable to Dow Corning and non-negotiable, further negotiations would have been "unproductive," and Dow Corning was more than "within its rights to terminate negotiations" and file a declaratory judgment action. *SanDisk,* 480 F.3d at 1382; *Sony Elec.*, 497 F.3d at 1286; *see also* Zoes Decl. at pars.17-19.

Cree's "take-it or leave-it" approach left Dow Corning with what it considered unacceptable licensing options and is another factor "under all the circumstances" that supports declaratory judgment jurisdiction. Cree emphasizes that of the licensing programs offered, only one–the "SiC Bulk Growth and Wafering" program, contains the patents-in-suit. However, Cree did not insist that

-24-

Dow Corning needed a license to that particular program containing the patents-in-suit. Rather, Cree contends that it presented and offered Dow its choice of five programs. Cree did not respond to Dow Corning's allegation that it was unwilling to license individual patents or negotiate any licensing term.

Seventh, on September 8, 2011, in anticipation of the next September 28, 2011 meeting, George Brandes sent an email letter to Tim Troy. In that email, Cree confirmed that it had given Dow Corning all relevant materials and set a deadline for Dow Corning's response. Zoes Decl. ("In our previous meetings and by email Cree has provided Dow Corning with a description of Cree's Materials Licensing Program, lists of patents and license terms; we are expecting your response at our Sept. 28th meeting."). Zoes Decl. Ex. 7. In the preceding eleven months, Cree had not established any deadline (ECF No. 19 at 12), so this correspondence reflected to Dow Corning a clear departure from Cree's past interaction with Dow Corning, indicating that Cree was now accelerating closure on its license or litigate patent "enforcement program." It is therefore another significant factor showing that there was a controversy "of sufficient immediacy and reality to warrant [declaratory judgment jurisdiction]." *MedImmune*, 549 U.S. at 127 (emphasis added); *see also Hewlett-Packard Co.*, 587 F.3d. at 1362 (finding jurisdiction and holding that patentee imposed deadlines were a supporting factor under all the circumstances). Cree generally contends

Taking the cumulative effect of Cree's acts and statements over the eleven-month period of discussions, Dow Corning contends that there is a substantial controversy of sufficient immediacy and reality to warrant declaratory judgment jurisdiction because Dow Corning, aware that future discussions on Cree's inflexible terms would be futile, was not obligated to wait for Cree to choose the time and place for initiating suit. *SanDisk*, 480 F.3d at 1382; *Sony Elec.*, 497 F.3d at 1286. In

line with the purposes of the Declaratory Judgment Act, Dow Corning submits that it had the right to clear the cloud of legal uncertainty regarding some of its most critical, new semiconductor products and file this patent declaratory judgment action. *See Caraco Pharm. Lab., Ltd. v. Forest Lab., LLC.*, 527 F.3d 1278, 1293 (Fed. Cir. 2008) ("the purpose of the Declaratory Judgment Act in patent cases is to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights.") ("internal citations omitted).

Finally, Dow Corning notes that the fact that it entered into negotiations with Cree does not result in this Court lacking jurisdiction over the instant action. Dow Corning represents that it entered into negotiations in order to avoid the costs and burdens of litigation regarding its own SiC technologies, not to secure Cree technology. Zoes Decl. pars. 18, 21-14. Dow Corning submits that the fact that it did not explain this intent to Cree should have no impact on the Court's determination of declaratory judgment jurisdiction. Moreover, Dow Corning emphasizes that the fact that Cree characterized the negotiations as friendly and business-like is irrelevant to whether a substantial and immediate controversy existed between the parties at the time the complaint was filed.

Cree, however, contends that Dow Corning omits key facts out of the Amended Complaint because those facts undermine the impression that the purpose of the business discussions was to avoid potential litigation regarding the patents-in-suit. The Complaint does not mention Dow Corning's request that Cree present a "broader list of patents that Cree would be willing to license." ECF No. 19 Ex. 6. Nor does Dow Corning mention its request for "technology transfer." *Id.* After Cree had introduced its licensing program, Dow Corning wanted to explore the possibility of acquiring an even broader range of patented technology. Moreover, Dow Corning's request for technology transfer shows that Dow Corning was interested in obtaining access to patented

technology that it implied it did not currently use or have, meaning these discussions were not–as the Complaint suggests– about avoiding litigation over Dow Coming's current activities.

Cree also contends that the Complaint also takes out of context George Brandes' September 8, 2011 email and uses it to suggest that Cree imposed a "short deadline" to the discussions. In his email, Mr. Brandes states: "In our previous meeting and by email Cree has provided Dow Coming with a description of Cree's Materials Licensing Program, lists of patents and license terms; we are expecting your response at our Sept. 28th meeting." Ex. 11. This statement is not a deadline but communicating the purpose of the meeting.

At oral argument, Cree urged the Court to look at the contemporaneous record of the communications between the parties, including the e-mails exchanged and the presentation slides from the meetings, as opposed to the single declaration provided by Dow Corning after the complaint was filed. Cree contends that the evidence in the contemporaneous record suggests that was not a substantial controversy between the parties, but instead ongoing business negotiations related to Dow Corning's potential participation in Cree's licensing program.

Additional information is necessary at this juncture regarding: (1) Cree's withdrawal of its offer to license individual patents or for a technology transfer; (2) the packages of patents offered at the September 28, 2011, meeting and how those packages were presented; (3) Cree's suggestion that licensing was necessary because of overlap in the two company's patents creating an "ambiguity" in the market; and (4) the payment and royalty terms that Cree proposed to Dow Corning in conjunction with its licensing packages and whether those terms, as well as the response deadline, were negotiable or "take it or leave it," as Dow Corning suggests. A sixty-day period of discovery is authorized during which each party is permitted to take up to three depositions of the

opposing parties' employees to discern the intentions of the parties.

## IV.   Conclusion

Accordingly, it is **ORDERED** that a limited evidentiary hearing is **SCHEDULED** for **September 19, 2012 at 2:00 p.m.** to address the issues outlined above.

It is further **ORDERED** that the parties are **DIRECTED** to file supplemental briefing on or before **August 24, 2012** explaining how the information learned during the limited discovery reflected the intentions of the parties and how this information effects the analysis of Defendant's motion to dismiss for lack of subject matter jurisdiction.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 11, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 11, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

---

-28-