UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOW CORNING COMPOUND
SEMICONDUCTOR SOLUTIONS, LLC,

        Plaintiff,                            Case No. 11-14255
                                              Honorable Thomas L. Ludington

v.

CREE, INC.,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS**

Between October 2010 until September 2011, Dow Corning Semiconductor Solutions, LLC and Cree, Inc. discussed the possibility of Dow Corning licensing some of Cree's intellectual property. Cree claims it was simply marketing a licensing program to Dow Corning for its silicon carbide materials patents. Dow Corning concluded that the licensing program was being offered only as an alternative to patent infringement litigation, and decided the best defense was a good offense. Accordingly, Dow Corning filed a declaratory judgment complaint against Cree on September 27, 2011. Dow Corning seeks a determination that three of Cree's patents — U.S. Patent No. 7,314,520; U.S. Patent No. 7,314,521; and U.S. Patent No. 7,294,324 (collectively, the Patents) — are invalid, and that regardless of their validity, Dow Corning has not infringed upon them.

Cree filed a motion to dismiss the case for want of subject matter jurisdiction, alleging that there is no case or controversy. According to Cree, it never even considered whether Dow Corning had infringed upon its intellectual property, and never had plans to enforce those patents.

Ultimately, the discovery depositions of the Defendant's representatives confirm that no actual controversy exists. Notwithstanding the circumstantial evidence Dow Corning wishes to highlight, Defendant's representatives unequivocally testified infringement litigation was not a possibility. This Court lacks subject matter jurisdiction, and the complaint will be dismissed.

# I

## A

Both Dow Corning and Cree are engaged in manufacturing electronic-grade silicon carbide (SiC), which is a high-performance semiconductor material incorporated into a broad range of lighting, power, and communication devices. Given their increased efficiency over traditional silicon parts, the demand for high-quality SiC materials is growing rapidly worldwide.

Cree owns numerous patents related to the creation of SiC materials. In 2010, it decided to begin licensing that intellectual property to other companies, companies like Dow Corning. The proposal was simple: Cree would receive an initial payment, a royalty payment for the licensee-company's sales, and the SiC market would continue to expand as more companies produced SiC components. This, in turn, would encourage further growth in the market, and Cree would benefit as a result.

The idea originated when Nippon Steel Corporation, another SiC manufacturer, requested that Cree license its SiC patents. After discussions with Nippon Steel, Cree's Intellectual Property Committee decided to institute a SiC licensing program in August 2010. The program contemplated both continued discussions with Nippon Steel and offering a license to other manufacturers in the industry.

In pursuit of that goal, on October 29, 2010, Cree contacted two additional companies about possible licensing agreements — Dow Corning and II-VI, Inc. Cree sent both companies

letters which identified Cree as a "leading innovator and manufacturer of SiC materials," established that Cree had "recently implemented a licensing program," and proposed meetings in December 2010.  *See* Cree's Supp. Br. Exs. 2, 3, ECF No. 59.  The letters did not mention the subject of patent infringement or potential litigation.

Representatives from II-VI invited Cree to their facilities for a meeting on December 21, 2010.  At that time, Cree provided a seventeen-slide powerpoint presentation which focused on nine patents.  Cree's presentation indicated that "[m]ultiple SiC material suppliers with full rights to make and sell material will speed adoption" and "[a]ddressing IP issues removes ambiguity from the marketplace."  Cree's Supp. Br. Ex. 5, at 16.  Sometime after the meeting, II-VI indicated to Cree that it was not interested.  Dr. George Brandes, Cree's Director of Intellectual Property Strategy and Business Development, established that was "where the discussions ended."  Dr. Brandes 30(b)(6) Dep. 202.  Cree did not initiate litigation against II-VI to enforce its patents after II-VI declined to purchase a license.  Nor did Cree ever insinuate that II-VI had infringed upon its intellectual property.

Meanwhile, Cree was pursuing similar opportunities with Dow Corning.  Dr. Brandes sent the original October 29, 2010 letters, and on December 8, 2010, he emailed Timothy Troy, Dow Corning's Senior IP Counsel.  Dr. Brandes indicated that his original attempt to contact Dow Corning had been unsuccessful, and that he had since received Mr. Troy's "name as a contact point."  Cree's Supp. Br. Ex. 12, at 3.  Dr. Brandes attached the original October 29 letter, indicated he wanted to visit Dow Corning to introduce Cree's SiC Materials licensing program, and suggested a meeting in January or February 2011.  *Id*.  Receiving no response, Dr. Brandes followed up with an additional email nine days later.  *Id.* at 2.  He noted it was a busy time of year, and reiterated his desire to introduce Cree's licensing program to Dow Corning.

Mr. Troy responded that same day, December 17, 2010, and indicated that Cree was welcome to come to Midland, Michigan for a meeting, or could suggest another convenient location. Once a location was established, Mr. Troy agreed it was a good idea that a meeting be placed on the companies' calendars. *Id*. at 1.

Representatives of Cree and Dow Corning finally met face-to-face on March 8, 2011. At that time, Cree provided the same presentation it had provided for II-VI the previous December.[1] The presentation, like the October letters, did not mention suspected patent infringements or impending litigation.

Six weeks after Cree's meeting with Dow Corning, it arrived at a deal with Nippon Steel. On April 25, 2011, Dr. Brandes forwarded to Dow Corning, via email, a copy of a press release regarding the arrangement between the companies. Dr. Brandes believed Dow Corning would be interested in the press release as it involved "a recently concluded SiC materials patent license agreement." Cree's Supp. Br. Ex. 14, at 1. The attached press release outlined the deal between Cree and Nippon Steel, along with a quote from Nippon Steel's Dr. Misao Hashimoto, a fellow and director of the Advanced Technology Research Laboratory. Dr. Hashimoto indicated, "The good working relationship between Cree and Nippon Steel enabled us to achieve our commitment for growing the global SiC market." *Id*. at 3. In his email to Dow Corning, Dr. Brandes also requested a second meeting "in late May or early June to continue [SiC licensing] discussions." *Id*.

Tom Zoes, the Director of Dow Corning's Power Electronics Business, responded to Dr. Brandes' April 25, 2011 email four days later. Mr. Zoes indicated a meeting between June 27 and July 8 would be beneficial to discuss potential scenarios for technology licensing and a "broader list of patents that Cree would be willing to license." Cree's Supp. Br. Ex. 16, at 1.

---

[1] With one exception: the date on the first slide was changed from December 21, 2010 to March 8, 2011.

Then, Mr. Zoes recommended a third meeting "for late August" after Dow Corning had an opportunity to assess the licensing portfolio Cree was offering. *Id*.

The second meeting between the companies was held on June 29, 2011 in Midland, Michigan — and here the stories begin to diverge. Representatives from Dow Corning and Cree discussed five different sets of material patents. As the meeting concluded, Cree presented its business terms for a deal (Cree believes Dow Corning requested the terms and that it had no intention of providing them until the third meeting). Dr. Brandes indicated Cree's offer was a non-exclusive license in exchange for an initial payment of $4 million, with a 6% royalty for product sales. According to Mr. Zoes and Mr. Troy, Dr. Brandes indicated the terms were "non-negotiable." Zoes 30(b)(6) Dep. 138, Cree's Supp. Br. Ex. 13; Troy Dep. 79, Dow Corning's Supp. Br. Ex. L.[2] Cree asserts otherwise: that this was simply its "initial offer," and that it fully expected Dow Corning to respond with a counter-offer. Brandes 30(b)(6) Dep. 11–12; Jacobson Dep. 164.

In any event, the two companies met again, for the third time, on September 28, 2011 (the day after Dow Corning filed this suit). At the meeting, Dow Corning presented several business collaboration options in addition to the possibility of a technology transfer between the companies. During that presentation, for the first time, Dow Corning told Cree that it was not interested in licensing Cree's patents. Zoes 30(b)(6) Dep. 230–31. At the end of its presentation, Dow Corning indicated that this action had been filed. At that point, Cree's representatives ended the meeting.

---

[2] Mr. Zoes indicated that the initial payment was for $6 million, not $4 million, but that has been undermined by Mr. Troy's testimony and Dow Corning's motion papers. Accordingly, Mr. Zoes' recollection concerning the amount of the initial payment will not be considered for purposes of this Opinion.

**B**

On December 22, 2011, Dow Corning amended its complaint after Cree filed its first motion to dismiss for lack of subject matter jurisdiction. Cree renewed its motion to dismiss three weeks later.

Dow Corning alleges that beginning in October 2010 it became "the target of a continued campaign by Cree to enforce its patents on semiconductor material against Dow Corning's SiC material products." Amended Compl. ¶ 23, ECF No. 14. Dow Corning concludes that "[b]ased on Cree's aggressive licensing conduct, public statements, and history of litigation in support of its patent enforcement program, a substantial controversy now exists between the parties which is of sufficient immediacy and reality to warrant declaratory relief." *Id*. at ¶ 25.

As established by *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009), Cree's "objective words and actions . . . are controlling." Declaratory judgment jurisdiction will exist if Cree acted in a way "that can be reasonably inferred as demonstrating intent to enforce a patent." *Id*. Because it was necessary to evaluate the accuracy of Dow Corning's Factual assertions concerning Cree's actions, a limited amount of discovery and supplemental briefing was ordered. *Id*. at 3, 28.

Cree returns with important testimony, under oath, from its employees; specifically, Dr. Brandes and Dr. Charles Jacobson, Cree's Associate General Counsel for Intellectual Property. Dr. Brandes was asked about Cree's intentions if Dow Corning rejected the offer for a license. He testified as follows:

> Q: If Dow Corning had rejected the license terms you proposed and not counteroffered, did you have any plans as to what you would do next with respect to Dow Corning and the silicon carbide material patents?
>
> A: No.
>
> \*   \*   \*   \*   \*

> Q: Was there a concern at Cree that if Dow Corning didn't accept Cree's business terms for the silicon carbide material patent portfolio there would be patent litigation?
>
> A: Was there a concern at Cree?
>
> Q: Yes.
>
> A: No.

Brandes 30(b)(6) Dep. 193, 194. Dr. Jacobson was also questioned at length about whether Cree had intentions to bring a lawsuit against Dow Corning to enforce its patents. Concerning the initial October 2010 letter, he testified as follows:

> Q: So there were no plans for – for patent infringement litigation in connection with this letter?
>
> A: Absolutely not. And if we had – if Cree had considered enforcement program, which this was not, this was a licensing program where we were trying to provide access to our technology; if on the other hand it was down a different fork, which would be enforcement of our IP, we would have had to have done things like sought [sic] outside counsel, which we didn't do. We would have had to have budgeted for it, which we didn't do. We would have had to had [sic] an internal meeting with our IP committee to determine whether this is something we wanted to do. We did not. We would have had to get material and analyze it, which we had not. So those are four things that we would have had to have done, none of which we did.

Jacobsen Dep. 83. Dr. Jacobson indicated that had Dow Corning declined to acquire a license in Cree's technology, it would have been "no big deal." *Id*. at 133. Cree did not intend to apply any pressure on Dow Corning if they were not interested in the technology. *Id*. Dr. Jacobsen was asked if Cree would have brought a patent litigation suit against Dow Corning if no license was taken. He responded, "absolutely not. . . . there was never an intent to file a patent litigation." *Id*. at 176–77.

## II

Generally, motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction fall into two categories: facial attacks and factual attacks.

- 7 -

*United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  A factual attack, like Cree's motion to dismiss, challenges the factual existence of subject matter jurisdiction.  *Id*.  "On such a motion, no presumptive truthfulness applies to the factual allegations and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Id.* (citation omitted).  Further, where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion.  *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990) (citing *Rogers v. Stratton Indust., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

> The Declaratory Judgment Act provides:
>
> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such a declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201.  Of course, the Declaratory Judgment Act is not an independent basis for subject matter jurisdiction.  *See Prasco, LLC v. Medics Pharm. Corp.*, 537 F.3d 1329, 1335 (Fed. Cir. 2008). Instead, it supplements a court's existing jurisdiction.  *Id.*  A federal court's jurisdiction under the Declaratory Judgment Act is therefore limited by Article III, which restricts the judicial power to actual "cases" or "controversies."  U.S. Const. art. III; *Prasco*, 537 F.3d 1335.  Federal courts have jurisdiction only if the "facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2009).

In patent cases, "declaratory judgment jurisdiction generally will not arise merely on the basis that a party learns of the existence of a patent owned by another or even perceives such a patent to pose a risk of infringement without some affirmative act by the patentee." *SanDisk*

*Corp v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380–81 (Fed. Cir. 2007). Affirmative acts giving rise to jurisdiction are not limited to a patentee's explicit assertion of right, the case or controversy requirement is satisfied by "conduct that can be reasonably inferred as demonstrating intent to enforce a patent . . ." *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009). In short, "all the circumstances must show a controversy" between the parties. *Micron Tech., Inc. v. Mosaid Tehc., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008) (internal quotation marks omitted).

### III

Dow Corning suggests seven issues that, taken together, indicate a substantial controversy of sufficient immediacy and reality to warrant declaratory judgment jurisdiction:

> Cree's annual reports, press releases, and semiconductor materials litigation history is strong evidence of an aggressive patent enforcement program. Cree's initial letter identified two key Dow Corning SiC products and Cree patents that may cover them. During the first meeting, Cree emphasized patents most likely to cover the targeted and existing Dow Corning products and asserted that Dow Corning products had "IP" and "market access" concerns with respect to Cree's patents. Then, during the second meeting, Cree presented an all or nothing licensing proposal that included many patents that were particularly useless for Dow Corning. This proposal, along with Cree's payment structure, was non-negotiable. Finally, in advance of the final meeting, now 11 months after its initial contact and having given Dow Corning all relevant licensing materials to consider, Cree set an end date for negotiations. These facts clearly show a substantial and immediate controversy between the parties.

Dow Corning's Resp. 18. Under the totality of the circumstances, however, there is no substantial controversy between these parties, and declaratory judgment jurisdiction is lacking.

### A

The first three issues identified by Dow Corning all relate to its assertion that Cree's litigation history is "strong evidence of an aggressive patent enforcement program." *Id*. Dow

Corning emphasizes Cree's 10-K filing for the fiscal year ending in June 2006. In that filing, Cree established:

> Licensing activities and lawsuits to enforce intellectual property rights, particularly patent rights, are a common feature of the semiconductor industry. We both make and receive inquiries regarding possible patent infringements in the normal course of business. Depending on the circumstances, we may seek to negotiate a license or other acceptable resolution. If we are unable to achieve a resolution by agreement, we may seek to enforce our rights or defend our position through litigation.

Dow Corning's Resp. Ex. 1. Next, Dow Corning emphasizes a press release from 2006 related to one of the six patent-enforcement lawsuits Cree has filed since 2000. In that press release, Cree's CEO commented that "[t]he filing of this suit demonstrates Cree's willingness to protect our R&D investments and patent rights, especially at a time when some segments of the LED marketplace act as if there are no issues with intellectual property." Dow Corning's Resp. Ex. 3. Finally, Dow Corning relies on the fact that Cree has filed six patent-enforcement suits in the past 12 years.

Dow Corning believes Cree has "made no secret of its business practice of initiating licensing negotiations, followed by litigation if needed." Dow Corning Resp. 13. Dow Corning proceeds, "Cree has consistently backed up its public statements by action — suing four different companies in six suits for infringing 10 patents." *Id*. at 14. Dow Corning asserts that "[e]ach of those 10 patents teach the use of SiC and GaN (both crystalline semiconductor materials) as lighting, power and communication components." *Id*. citing Cheung Decl. at ¶¶ 2, 3.

However, these factors, when viewed objectively, do not support Dow Corning's conclusion that it was facing litigation if it did not capitulate to Cree's demands.

Prior litigious conduct "is one circumstance that can be considered" when determining the existence of a case or controversy. *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1380

(Fed. Cir. 2012). For example, in *Micron Tech.*, the patentee "pursue[d] a systematic licensing and litigation strategy" and issued public statements and annual reports confirming its "intent to pursue an aggressive litigation strategy." 518 F.3d at 899, 901. But that was not all. In fact, the court relied primarily on the fact that the declaratory judgment plaintiff had received "several threats" of litigation from the patentee, and then watched it "sue each of the other leading DRAM manufacturers" before filing its declaratory judgment action. *Id.* at 901.

However, "a history of litigation concerning different products covered by unrelated patents is not the type of pattern of prior conduct that makes reasonable an assumption that the patentee will file suit regarding a new or different product." *3M Co.*, 673 F.3d 1380 (internal quotation marks omitted) (quoting *Prasco*, 537 F.3d at 1341). *See also Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377, 1382 (Fed Cir. 2010) ("[T]he fact that [a patentee] had filed infringement suits against other parties for other products does not, in the absence of any act directed toward [the declaratory judgment plaintiff], meet the minimum standard discussed in *MedImmune*.").

In this case, guided by the principles outlined above, Cree's litigation history weighs against declaratory judgment jurisdiction here. Unlike the parties in *Micron Tech.*, Cree did not issue threats to Dow Corning and then turn around and sue other SiC manufacturers. In fact, Cree has never sued any company to enforce its SiC material patents.

A close inspection of the previous ten patents Cree has sought to enforce reveals that not one of the patents involves the creation of SiC materials. The distinction is highlighted when the abstracts for the three Patents in this action (involving the creation of SiC wafers[3]) are contrasted

---

[3] Abstract of U.S. Patent No. 7,294,324 provides, "A high quality single crystal wafer of SiC is disclosed. The wafer has a diameter of at least about 3 inches (75 mm) and at least one continuous square inch (6.25 cm$^2$) of surface area that has a basal plane dislocation volume density of less than about 500 cm$^{-2}$ for a 4 degree off-axis wafer." Abstract of U.S. Patent No. 7,314,520 provides, "A high quality single crystal wafer of SiC is disclosed

with the abstracts for the ten previously-litigated patents. Of those ten, eight involve light-emitting diodes (LEDs) or light-emitting devices, and two involve the creation of Gallium Nitride (GaN).[4] While a few of the patents describe SiC as a possible material for the construction of LEDs, this is in addition to many other materials that can be used, and the creation of SiC materials is not discussed in any way. Cree has never filed a lawsuit to enforce a SiC materials patent.

Dow Corning argues that GaN and SiC have a "close relationship" as materials for lighting and are basically interchangeable. Dow Corning's Supp. Br. 20. Dow Corning concludes it is therefore appropriate to consider "Cree's litigation history enforcing its patents

---

having a diameter of at least about 3 inches and a 1 c screw dislocation density of less than about 2000 $cm^{-2}$." Abstract of U.S. Patent No. 7,314,521 provides, "A high quality single crystal wafer of SiC is disclosed having a diameter of at least about 100 mm and a micropipe density of less than about 25 $cm^{-2}$." Each abstract was acquired by searching the applicable patent number at www.patentlens.net on February 28, 2013.

[4] Abstract of U.S. Patent No. 5,686,738 provides, "This invention relates to a method of preparing highly insulating GaN single crystal films in a molecular beam epitaxial growth chamber." Abstract of U.S. Patent No. 6,051,849 provides, "A gallium nitride semiconductor layer is fabricated by masking an underlying gallium nitride layer with a mask that includes an array of openings therein, and growing the underlying gallium nitride layer through the array of openings and onto the mask, to thereby form an overgrown gallium nitride semiconductor layer." Abstract of U.S. Patent No. 6,614,056 provides, "An LED with improved current spreading structures that provide enhanced current injection into the LED's active layer, improving its power and luminous flux." Abstract of U.S. Patent No. 6,657,236 provides, "This invention describes new LEDs having light extraction structures on or within the LED to increase its efficiency." Abstract of U.S. Patent No. 6,885,036 provides (like Patent '056), "An LED with improved current spreading structures that provide enhanced current injection into the LED's active layer, improving its power and luminous flux." Abstract of U.S. Patent No. 7,211,833 provides, "Semiconductor light emitting devices, such as light emitting diodes, include a substrate, an epitaxial region on the substrate that includes a light emitting region such as a light emitting diode region, and a multilayer conductive stack including a reflector layer, on the epitaxial region." Abstract of U.S. Patent No. 7,557,380 provides, "Light emitting devices include an active region of semiconductor material and a first contact on the active region. The first contact is configured such that photons emitted by the active region pass through the first contact." Abstract of U.S. Patent No. 7,611,915 provides (like Patent '833), "Semiconductor light emitting devices, such as light emitting diodes, include a substrate, an epitaxial region on the substrate that includes a light emitting region such as a light emitting diode region, and a multilayer conductive stack including a reflector layer, on the epitaxial region." Abstract of U.S. Patent No. 7,737,459 provides, "A light emitting diode is disclosed that includes a silicon carbide substrate and a light emitting structure formed from the Group III nitride material system on the substrate. The diode has an area greater than 100,000 square microns and has a radiant flux at 20 milliamps current of at least 29 milliwatts at its dominant wavelength between 390 and 540 nanometers." Abstract of U.S. Patent No. 7,795,623 provides, "A light emitting device includes a p-type semiconductor layer, an n-type semiconductor layer, and an active region between the n-type semiconductor layer and the p-type semiconductor layer. A non-transparent feature, such as a wire bond pad, is on the p-type semiconductor layer or on the n-type semiconductor layer opposite the p-type semiconductor layer, and a reduced conductivity region is in the p-type semiconductor layer or the n-type semiconductor layer and is aligned with the non-transparent feature." Each abstract was acquired by searching the applicable patent number at www.patentlens.net on February 28, 2013.

against GaN-based products in the totality of the circumstances here in support of declaratory judgment jurisdiction." *Id*.

But GaN and SiC are different materials, covered by different patents. They are both distinct from the LEDs they are incorporated into, and the patents that cover those devices. Concluding that Cree's effort to protect LED or GaN production patents is conclusive evidence that Cree would also sue for SiC components is misplaced. Litigation to protect one patented component in one application or industry does not indicate a more general license or litigate business strategy for every other component a company may manufacture and market. *See 3M Co.*, 673 F.3d 1380.

Further, as Dr. Brandes testified, at least three of Cree's previous lawsuits involved "no licensing discussions prior to the lawsuits." Brandes 30(b)(6) Dep. 129. So at most, Cree initiated three lawsuits against two companies over the past twelve years after licensing talks failed. This does not demonstrate a business practice of initiating licensing negotiations followed by litigation.

**B**

Next, Dow Corning asserts that Cree's October 29, 2010 letter was "Cree launch[ing] its patent enforcement program against Dow Corning . . . identifying two of Dow Corning's most critical products." Dow Corning's Resp. 14. However, "a communication from a patent owner to another party, merely identifying its patent and the other party's product line, without more, cannot establish adverse legal interests between the parties, let alone the existence of a 'definite and concrete' dispute." *Hewlett-Packard*, 587 F.3d at 1362. Dow Corning's contention — that Cree was gearing up for enforcement — is simply not supported by the evidence produced in response to Defendant's motion.

Cree sent the same letter to II-VI. Its intentions are understandable: grow the SiC market by increasing the number of companies that produce SiC materials. Even Mr. Zoes of Dow Corning agrees with that: he said, "the market is likely to grow more rapidly and more broadly if there are more than one supplier. That's pretty typical in the semiconductor industry." Zoes 30(b)(6) Dep. 74.

This point relates directly to Dow Corning's claim that the March 2011 powerpoint presentation regarding IP concerns in the SiC market, and the corresponding June 2011 presentation, are proof of Cree's intent to enforce its patents. Dow Corning argues that "Cree's message, while carefully omitting the word 'infringement,' was nevertheless overt and clearly delivered the message that Dow Corning's new 3- and 4-inch SiC products had infringement issues with respect to Cree patents." Dow Corning's Resp. 16. Dow Corning believes that "these were not random truisms spoken into the wind. These were specific bullet points carefully chosen for a reason, and directed and presented to Dow Corning in the summary sections of not one but two separate presentations regarding Cree's patents." Dow Corning's Supp. Br. 15.

Carefully chosen and directed at Dow Corning? Cree introduced the same slideshow to II-VI in December 2010. Apparently, then, the points were first carefully formulated and presented to a different company with different products. And despite the October 29, 2010 letter, and the December 2010 powerpoint, when II-VI opted not to take a license, Cree did not file suit. In fact, Cree did nothing at all.

Finally, Dr. Brandes and Dr. Jacobsen both confirmed that Cree has never even analyzed Dow Corning's SiC materials. Dr. Brandes testified:

> Q: Did you have any reason to think that Dow Corning didn't have full rights to make and sell its silicon carbide wafer materials?

> A: I have never looked at Dow Corning's material, I don't know. I'm simply in this meeting with this presentation announcing that we have patents, silicon carbide materials patents that are available for license.

Brandes 30(b)(6) Dep. 109. Dr. Jacobsen established that when slideshows were presented to Dow Corning, neither he nor Dr. Brandes — or anyone else on Cree's IP legal team for that matter — had "reviewed any silicon carbide material to make a determination whether there are any IP concerns." Jacobsen Dep. 114.

The evidence that has been mustered supports the assertion that Cree was attempting to do just what it claimed — grow the SiC market by expanding the number of companies producing SiC materials — not that it was intent on limiting Dow Corning's use of its patents. Dow Corning cannot accurately recast a letter and slideshow presented to another company, which was never sued, as evidence of Cree's determination to protect its patents in court.

C

Dow Corning also claims that the way Dr. Brandes initially made contact is representative of a case and controversy between the parties. Relying on *Hewlett-Packard*, 587 F.3d at 1360–61, Dow Corning asserts that declaratory judgment can be found when a "patentee took the affirmative step of twice contacting declaratory judgment plaintiff directly." Dow Corning's Resp. 15 (brackets omitted). Here, because Dr. Brandes sent a letter on October 29, 2010, and two emails in December 2010, Dow Corning concludes his conduct was even more indicative of a conflict.

Of course, the situation in *Hewlett-Packard* bears little resemblance to the case here. In that case, the patentee sent a letter to the declaratory relief plaintiff that referenced one patent it had recently acquired, used the word litigation, discussed its "rights against any of your ongoing or planned activities," and mentioned an "actual case or controversy regarding the enclosed patent." *Hewlett-Packard*, 587 F.3d at 1360. The letter also requested that the declaratory

judgment plaintiff not file a declaratory action, and demanded a response within two-weeks' time. *Id*.

Further, the court placed particular emphasis on the fact that this was a "non-competitor patent holding company" directly contacting the declaratory judgment plaintiff. *Id*. at 1363 (quoting *Hewlett-Packard Co. v. Acceleron, LLC*, 601 F. Supp. 2d 581, 587 (D. Del. 2009)). The court noted that "the receipt of such correspondence from a non-competitor patent holding patent company may invoke a different reaction than would a meet-and-discuss inquiry by a competitor, presumably with intellectual property of its own to place on the bargaining table." *Hewlett-Packard*, 587 F.3d at 1363 (ellipsis deleted) (quoting *Hewlett-Packard*, 601 F. Supp. 2d at 589). Finally, the court believed it was significant that the patentee was "solely a licensing entity, and without enforcement it receives no benefits from its patents." *Hewlett-Packard*, 587 F.3d at 1364.

Dow Corning's attempt to portray Dr. Brandes' letter and emails as evidence of a controversy fall short of the circumstances in *Hewlett-Packard*. Dr. Brandes sent the original letter, the same one he sent to II-VI, without reference to litigation or any timeline for a response. He waited six weeks before attempting to follow up, and did so then only because he learned his original contact had moved to another position. Dr. Brandes' December 8, 2010 email to Mr. Troy indicated that he simply wished to "introduce Cree's SiC Materials licensing program" and requested a meeting sometime in the following three months. Cree's Supp. Br. Ex. 12, at 3. No timelines for responding. No mentions of litigation, of rights, or infringements. Dr. Brandes' second December 2010 email recognized that it was a busy time of year, and reiterated his desire for a meeting in early 2011. *Id*. at 2. Additionally, Cree did not depend on enforcing its patents

to make them valuable — it manufactured SiC wafers and considered itself a leader in the industry.

Contrary to Dow Corning's claim that this was the beginning of an enforcement action, Dr. Brandes testified as follows:

> Q: Did you consider that, as a result of sending the letter in October of 2010 to Dow Corning . . . that it might lead to litigation over the Cree silicon carbide material patents?
>
> A: No. We're offering our patents for a license.

Brandes 30(b)(6) Dep. 85.

### D

Dow Corning's final two arguments relate to "negotiations" that took place during and subsequent to the second meeting in June 2011. Specifically, Dow Corning believes that Cree presented "non-negotiable licensing terms that were unacceptable to Dow Corning" along with demand for payment that was "non-negotiable and a take-it or leave-it offer." Dow Corning's Resp. at 16–17 (brackets omitted). Beyond that, Dow Corning concludes that Dr. Brandes' September 8, 2011 email was "setting a deadline for Dow Corning's response" where he wrote "we are expecting your response at our Sept. 28th meeting." *Id*. at 17 (quotation omitted). Dow Corning asserts that because Cree's licensing proposal "was unacceptable to Dow Corning and non-negotiable, further negotiations would have been 'unproductive,' and Dow Corning was more than 'within its rights to terminate negotiations' and file a declaratory judgment action." *Id*. (quoting *SanDisk*, 480 F.3d at 1382; *Sony Elec., Inc. v. Guardian Media Tech., Ltd.*, 497 F.3d 1271, 1286 (Fed. Cir. 2007)).

But Dow Corning has little evidence to claim that negotiations would have been unproductive. Its representatives never attempted to negotiate. Dow Corning maintains it "had no use for Cree's patents and was not interested in a license to them." Dow Corning's Supp. Br.

8. But then why did Dow Corning schedule two meetings after the first in March of 2011 to continue the discussion? *See* Cree's Supp. Br. Ex. 15. Dow Corning's claim that it was attempting to hedge against litigation is unpersuasive. Did it believe that having Cree's representatives make various presentations would make the company less likely to file suit? Further, Dow Corning's contention that it "sought on multiple occasions to see if some alternative arrangement could be negotiated with Cree" is also without merit. Dow Corning's Supp. Br. 8. Dow Corning never told Cree it was not interested in the licensing program.

Dow Corning's classification of Cree's offer as "non-negotiable" also does not support this Court's exercise of jurisdiction. Although Dow Corning representatives adamantly remember Dr. Brandes said the $4 million initial payment and royalty of 6% was non-negotiable, Mr. Zoes was just as adamant that the initial sum was $6 million. No one else remembers that figure. And Cree's representatives were just as clear that this was just an opening offer; one they never even intended to present until Dow Corning asked at the end of the meeting. *See* Brandes 30(b)(6) Dep. 11–12; Jacobson Dep. 164. Finally, after the second meeting, Dow Corning discovered that Cree had agreed to provide a license to Nippon Steel under a different arrangement. Certainly this weighs in favor of the offer being open to negotiation.

Which leads to Dr. Brandes' September 2011 email, requesting an answer at the final September 28, 2011 meeting. Again Dow Corning relies on *Hewlett-Packard* for the proposition that this was a deadline which should weigh in favor of declaratory judgment jurisdiction. Again, Dow Corning finds little support from that case. There, the declaratory judgment defendant's representative indicated, in his very first letter, that the plaintiff had to respond within two weeks. That is the type of "take-it or leave-it" deadline that demonstrates an intent to file suit. Here, Cree and Dow Corning had been "negotiating," at least in Cree's contemplation,

for almost a year. Cree had undertaken the expense of three trips to Midland, Michigan to further those talks. Dr. Brandes testified as follows:

> Q: On September 8th did you feel it was necessary to state your expectation that Dow Corning would respond by the September 28th meeting?
>
> A: I wanted to clarify that we were looking for them to provide the information that they had provided and I wanted to make certain that we knew that was to be forthcoming.
>
> Q: Why?
>
> A: Why did I want to do that? I want to make certain that, you know, setting an agenda for a meeting and I'm just following up and confirming that agenda.
>
> Q: Was there something going on that you needed to get a response from Dow Corning?
>
> A: That I needed to get a response from Dow Corning? No. But I'm traveling . . . I had three group – or three people traveling to Midland, Michigan for discussion and I certainly wanted to make certain that we knew what was to be discussed.

Brandes 30(b)(6) Dep. 192–93. This makes sense; Dr. Brandes wanted to ensure that Dow Corning would finally respond to Cree's licensing package on his third trip to Michigan.

The totality of the circumstances, considered from an objective standpoint, demonstrate that there is no case or controversy here. Cree's actions did not reasonably foreshadow litigation, and its motion to dismiss will be granted. That conclusion is buttressed by the fact that Cree's representatives have steadfastly testified they did not intend to sue Dow Corning over Cree's SiC patents.

### IV

Accordingly, it is **ORDERED** that Defendant's renewed motion to dismiss for lack of subject matter jurisdiction, ECF No. 42, is **GRANTED**.

It is further **ORDERED** that Defendant's motion to dismiss for lack of subject matter jurisdiction, ECF No. 41, is **DENIED** as moot.

It is further **ORDERED** that Plaintiff's complaint is **DISMISSED** with prejudice. This is a final order and closes the case.


Dated: March 13, 2013                                           s/Thomas L. Ludington
                                                                THOMAS L. LUDINGTON
                                                                United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 13, 2013.
                    s/Tracy A. Jacobs
                    TRACY A. JACOBS

---